JOY MANUFACTURING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 49773. Filed March 31, 1955.

*Harold R. Schmidt, Esq.,* and *Don Rose, Esq.,* for the petitioner. *Edward L. Cobb, Esq.,* for the respondent.

---

1086

**OPINION.**

Murdock, *Judge:* The petitioner tries unsuccessfully to explain that "'engineering fees' is a misnomer," they were "not actually fees" but only a "formula" to determine the appropriate number of shares of J-S stock to be issued to the petitioner which "was only entitled to stock, not money" and "hence petitioner had no taxable income based on such engineering fees." It then tries to shift the question of taxable income to the issuance of the stock, saying that the rule applicable here is that of *Eisner* v. *Macomber*, 252 U. S. 189, which stands "for the proposition that taxable income must be an *actual* gain or benefit derived by the taxpayer"; this case is precisely like a stock dividend (common on common) in which the taxpayer owns, after the dividend, only what he had before, evidenced by more pieces of paper; and "Once the September 27, 1948 commitment was made, petitioner could receive

only more pieces of paper to evidence its already-existing 100% ownership of Joy-Sullivan."

That argument is unsound [1] and does not go to the real issue in the case. The question here is not whether the petitioner received taxable income from the issuance to it of additional stock of its wholly owned subsidiary. No stock was issued during this year and the Commissioner has not determined that the income arises from the later issuance of the stock but instead that it arose from the earning and accrual of the engineering fees during the taxable year. The engineering fees due from J-S to the petitioner, pursuant to their agreement, were fees in a correct meaning of the word, i. e. compensation or payment for services and privileges. They represented proper expenses of J-S and they were income, as they accrued, to the petitioner, an accrual basis taxpayer. *United States* v. *Anderson,* 269 U. S. 422.

The petitioner, soon after acquiring the stock of J-S, decided to expand the operations of its new subsidiary to take advantage of the opportunities then present in Great Britain. It realized that J-S would need additional funds with which to operate on the larger scale. The petitioner did not choose, as it might have, to send its funds from the United States to Great Britain either as subscriptions to capital stock or as loans, but sought other means of meeting the needs of J-S. It tried to have J-S borrow funds in England, found that the small capital of J-S limited the latter's ability to borrow, and decided to solve the problem by purchasing additional stock of J-S with funds belonging to it which were already in England, the engineering fees then owed to it by J-S, and by assuring the creditor and the Bank of England through its subsidiary that it would use additional engineering fees, as they would accrue, for the same purpose until it had increased the outstanding capital stock of J-S to £250,000. The agreement whereby J-S was required to pay the petitioner engineering fees was already in existence and was quite separate from the arrangements later made by J-S for obtaining loans from the Trust Company.

No doubt the petitioner could have settled the whole matter by transferring sufficient funds from the United States to subscribe for the entire proposed increase. But the petitioner preferred and chose for its own convenience and purpose to use only the engineering fees

---

[1] The situation here does not resemble a stock dividend of common on common which, as the Supreme Court pointed out in *Eisner* v. *Macomber, supra,* involves "merely bookkeeping that does not affect the aggregate assets of the corporation or its outstanding liabilities" or increase the intrinsic value of the aggregate holdings of the stockholder but "simply increase[s] the number of the shares, with consequent dilution of the value of each share." Here, if it is of importance, a liability of J-S owing to the petitioner was invested in later years by the petitioner in additional stock of its wholly owned subsidiary with a consequent decrease in the liabilities of the subsidiary and an equal increase in the assets of the subsidiary. A corporate resolution to pay salaries but to pay them in stock was held to be a stock dividend in *Deloss E. Daggitt,* 23 T. C. 31. This is not such a case. See also *W. Q. Wright,* 10 B. T. A. 806, involving facts unlike those here present.

and, consequently, the increase in capital had to be piecemeal, since the Capital Issues Committee would not authorize an increase in capital except to the extent that engineering fees had actually accrued and become the property of the petitioner available for purchase of stock. The first actual increase in the capital stock of the petitioner was not made until after the taxable year although more than sufficient funds for the purchase of that increase were available in engineering fees earned and accrued prior to the beginning of the taxable year. That increase brought the capital of J-S up to £100,000. Later increases brought it up to £250,000, and later still the petitioner again voluntarily invested an additional £50,000 in the stock of J-S, bringing it up to £300,000.

The petitioner desired, throughout the taxable year and prior thereto, that J-S should obtain the various overdraft facilities for which it was applying, and the petitioner, directly or indirectly, had authorized J-S to make the representations which it made to the Trust Company and which the Trust Company in turn made to the Bank of England to obtain the loans. However, the facts that the petitioner had voluntarily decided and agreed, prior to the taxable year, to use the engineering fees, which would accrue during the taxable year under a separate contract, to subscribe for additional stock of J-S, and after the taxable year actually used for that purpose the engineering fees which accrued during the taxable year, are entirely consistent with the recognition of the fees as income to the petitioner as they accrued, since the petitioner used an accrual method of accounting for and reporting its income. It is clear that the petitioner earned during the taxable year all of the fees involved herein; those fees as earned were accrued on the books of both J-S and the petitioner; they then belonged to the petitioner and represented taxable income to the petitioner on an accrual basis. The prior voluntary agreement of the petitioner to use those fees after they accrued for purposes desirable to it, the purchase of additional stock of J-S, thereby providing its subsidiary not only with necessary additional operating capital but also with the basis for needed credit, in no way relieved the petitioner of liability for income tax on the fees as they accrued. Cf. *Helvering* v. *Horst*, 311 U. S. 112; *Edgar M. Soreng*, 4 T. C. 870, affd. 158 F. 2d 340.

The petitioner did not use any of the engineering fees to purchase stock until after the close of the taxable year. Substantial amounts of engineering fees which accrued after the granting of the first overdraft facility were actually paid to the petitioner, some prior to the taxable year and some thereafter. The petitioner would report those portions of the fees as if it were on a cash basis of accounting and reporting, but it is not entitled to report its income that way and must report all of its income as it accrues without waiting to see what use

may be made of the income later. Cases involving taxpayers using a cash basis of reporting income are not in point.

The petitioner concedes that this is not a case of blocked currency. It contends on two grounds only that the engineering fees were not income to it as they accrued. The first, which has been discussed, is that the commitment to invest them in stock of J-S rendered them nontaxable as income to the petitioner, and the other is that in any event they were not collectible and should not be accrued by the petitioner during the taxable year. There are cases holding that an amount need not be accrued and taken into income by a taxpayer on an accrual basis where it appears in the year of accrual that the amount is uncollectible and, because of conditions then existing such as the poor financial condition of the debtor, "there is little or no likelihood of collection in the future." *Marguerite Hyde Suffolk & Berks*, 40 B. T. A. 1121, 1133; *Bettendorf Co.*, 34 B. T. A. 72. Cf. *Spring City Foundry Co.* v. *Commissioner*, 292 U. S. 182. This, however, is not such a case, although the finance vice president and treasurer of the petitioner testified that the fees were not collectible on September 30, 1949, or "in the foreseeable future." The question is not whether J-S had current assets sufficient to pay the entire amount of these fees on September 30, 1949, but is whether it was then reasonable to believe that they would ever be collected. The evidence shows clearly that there was no reason at any time during the taxable year of the petitioner to believe that the engineering fees which accrued during that year would be uncollectible because of the poor financial condition of J-S or the poor prospects of its business. It shows, to the contrary, that J-S was in good financial condition and the prospects for the continued success of its business were good. The slow-up of the National Coal Board in accepting delivery of machinery was temporary and, so far as this record shows, was being met successfully by J-S. The balance sheets, sales records, and earnings statements of J-S all tend to show that there was no reason why these engineering fees did not represent taxable income to the petitioner as they accrued. Furthermore, J-S transmitted some of them to the petitioner along with a dividend in the preceding year and did the same thing later.

*Decision will be entered for the respondent.*